## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

GAVIN K., through his Parents,                          :
ANDREW K. and ALLYSON K.,                              :
of Chester Springs, Pa. 19425,                         :
                                                       :
        AND                                            :
                                                       :
ANDREW K. and ALLYSON K, adults,                       :
individually, and on their own behalf,                 :        Civil Action
                                                       :
        Plaintiffs                                     :
    v.                                                 :        No.
                                                       :
DOWNINGTOWN AREA SCHOOL DISTRICT                       :
540 Trestle Place                                      :
Downingtown, Pa. 19335,                                :
                                                       :
        Defendant                     :

### COMPLAINT

### I.    Preliminary Statement

1.      Gavin K., a minor child with disabilities, and his parents, Andrew K. and Allyson

K. (collectively referred to as "Plaintiffs" or the "Family"), bring this action against Downingtown

Area School District ("Defendant" or the "District"), under the Individuals with Disabilities

Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.*, and its federal and state implementing

regulations; Section 504 of the Rehabilitation Act of 1973 ("Section 504"), 29 U.S.C. § 794, and

its federal and state implementing regulations; and Chapters 14 and 15 of the Pennsylvania Code.

2.      Gavin is a 13-year-old, rising eighth-grade student who resides with his parents in

the District and currently attends the Benchmark School ("Benchmark"), an accredited private

school for students from kindergarten to eighth grade with disabilities such as Gavin's in Media,

Pennsylvania. His enrollment there has at all times been funded by the Family.

3.      Gavin has attended Benchmark since 2016-17, his third-grade school year, and

before that attended the District's Shamona Creek Elementary School for first and second grade.

4.      Gavin displays academic deficits in the areas of basic reading skills (decoding), reading fluency, reading comprehension, and written expression (dyslexia), math problem-solving, and math calculation. He has also been diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD"), anxiety, and obsessive-compulsive behaviors. When he attended school in the District, he had an Individualized Education Program ("IEP").

5.      Given that Benchmark only educates to eighth grade, the Family faced a decision regarding where Gavin should be educated thereafter, recognizing that a return to a local public school was an attractive possibility, if it were to offer appropriate programming for his disabilities. Thus, before Gavin's seventh-grade year (the 2020-21 school year) started, Parents asked the District to evaluate Gavin. The District refused, pointing to the COVID-19 pandemic.

6.      Despite Gavin's diagnoses and continuing struggles, despite having previously evaluated and programmed for Gavin, and despite having his current educational records from Benchmark, the District failed to develop and offer him an appropriate program or placement to support his needs and enable him to make meaningful educational progress before the school year started.

7.      Therefore, the Family had no other option but to go forward with Gavin's placement at Benchmark for seventh grade.

8.      After the school year started and Gavin was already re-enrolled at Benchmark for seventh grade, the District finally evaluated Gavin and offered two revised program and placement plans. However, neither was available to Parents at the start of Gavin's seventh-grade school year, when they needed to make a decision about placement, and neither plan met Gavin's numerous significant educational needs, particularly his academics, executive dysfunction, and anxiety.

2

9.      The programming at Benchmark provides Gavin with the small, structured, and supportive learning environment he requires. As a result, Gavin has flourished there.

10.      In November of 2020, the Family filed a Special Education Due Process complaint against the District for its failure to offer Gavin a free and appropriate public education ("FAPE"). The Family sought tuition reimbursement for Gavin's placement for the 2020-21 school year, due to the School District's violations of IDEA and Section 504.

11.      After a hearing, a Pennsylvania Hearing Officer, in a written decision dated April 21, 2001 ("Decision"), properly determined that the District failed to offer FAPE to Gavin but denied tuition reimbursement, finding that the Benchmark School was inappropriate. This is an incorrect conclusion, particularly given the low burden to demonstrate that a private school for a child with disabilities is legally appropriate.

12.      Well-settled precedent requires this Court to undertake an independent review of the record and the decision of the hearing officer. *Rowley v. Board of Educ.*, 458 U.S. 176, 206-07 (1982); *Susan N. v. Wilson School Dist.*, 70 F.3d 751, 759 (3d Cir. 1995).

13.      After fully considering the entire record, this Court should reverse the Decision determining that Benchmark was inappropriate, find that the equities favor an award of tuition reimbursement or compensatory education, and order relief to the Family for the District's educational failures.

## II.      Parties

14.      Gavin was born in 2007 and, at all relevant times to this action, resided in Chester Springs, Pennsylvania, within the geographical boundaries of the District. Gavin is an eligible student with disabilities under IDEA and a "qualified handicapped student" under Section 504.

3

15.     The Downingtown Area School District is located at 540 Trestle Place, Downingtown, Pennsylvania. It is the recipient of several sources of federal funds and is an educational agency designated by Pennsylvania law and the Pennsylvania Department of Education for the provision of educational services to individuals residing within its boundaries. Such services include those mandated under IDEA and Section 504. 24 P.S. Chapter 13; 22 Pa. Code Chapters 14 and 15.

III.    **Jurisdiction and Venue**

16.     This Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 because this case raises federal questions under the IDEA and Section 504.

17.     Plaintiffs have exhausted administrative remedies where required under 20 U.S.C. § 1415(i), having litigated a special education due process complaint. 20 U.S.C. § 1415(i)(2)(A).

18.     20 U.S.C. § 1415 and 28 U.S.C. §§ 2201 and 2202 authorize Plaintiffs' claims and remedies. These provide for declaratory and any further relief deemed necessary and proper.

19.     All the Defendant's actions complained of here have taken place within the jurisdiction of the United States District Court for the Eastern District of Pennsylvania. Venue is appropriate in this District pursuant to 28 U.S.C. § 1391.

IV.    **Additional Facts Supporting Liability**

20.     Gavin enrolled in the District as a first-grade student during the 2014-15 school year. His struggles began when he first entered the District.

21.     According to the District's initial Evaluation Report ("ER") dated October 6, 2014, Gavin is a student with overall average cognitive ability. Under the IDEA, he is primarily identified

and eligible for services as a child with a Specific Learning Disability ("SLD") in reading skills and written expression (often referred to as dyslexia)[1], and math skills.

22.     During Gavin's fourth-grade school year, in November of 2017, Peter W. Wiley, Psy.D., a psychologist at Children's Hospital of Philadelphia ("CHOP"), confirmed those diagnoses and additionally diagnosed Gavin with Attention-Deficit Hyperactivity Disorder ("ADHD"), inattentive subtype; obsessive-compulsive behaviors; and anxiety.

23.     Gavin's initial IEP in the District included no goals related to his deficits in decoding and encoding or to his deficits in processing speed and working memory. That initial IEP included a mere four academic goals. They were poorly written, vague, not measurable, and they lacked benchmarks.

24.     Despite receiving one-on-one reading support in the District's Response to Instruction and Intervention ("RtII") program, Gavin continued to score far below expected grade level throughout first and second grades.

25.     Gavin's subsequent second-grade IEP included only three academic goals, two of which were continuations of the goals in the previous IEP, which still lacked benchmarks. That year, Gavin continued to show minimal improvements in reading.

26.     By the end of second grade, Gavin was struggling so significantly with his classwork that he had become increasingly discouraged and was beginning to resist completing schoolwork and homework. While he did show slight improvement in math and writing skills by the end of second grade, his overall progress was minimal, particularly in reading skills.

---

[1] "Dyslexia is a language-based deficiency in word decoding, spelling, and writing caused primarily by poor phonological processing." S-12 (report of Peter W. Wiley, Psy.D., of Children's Hospital of Philadelphia ("CHOP"), at 147. Although both appear in the record, in general the latter terms have been used throughout this case rather than "dyslexia."

27.     In light of Gavin's struggles and the District's failure to appropriately program for him, Parents had no choice but to remove Gavin from the School District and enroll him at their own expense in the Benchmark School at the start of his third-grade school year, in 2016-17.

28.     Gavin has continued to attend Benchmark for the remainder of elementary school and now middle school, where he recently completed his seventh-grade school year, in 2020-21. He has made considerable academic gains in reading, writing, mathematics, and executive functioning, with programming that appropriately and comprehensively addresses his needs.

29.     However, Benchmark only goes to eighth grade, is far from the Family's home, and Gavin has local friends who attend school in the District. As he and Parents discussed where he should next attend school, Gavin expressed interest in returning to the District, if possible.

A.     **The District's Failure to Offer an Appropriate Program/Tuition Reimbursement**

30.     On May 17, 2020, as Gavin concluded his sixth-grade school year at Benchmark, Parents emailed the District and asked it to reevaluate him. They gave their consent to remote testing due to COVID-19 to expedite the testing process. The District responded on May 19, 2020, improperly informing Parents that they would need to enroll Gavin in the District before the District would conduct an evaluation.

31.     Parents and the District exchanged multiple emails about records and enrollment. Then, on June 11, 2020, Parents received a Notice of Recommended Educational Placement ("NOREP") from the District, improperly refusing to evaluate Gavin due to COVID-19-related restrictions. Parents returned the NOREP on June 18, 2020, noting their disapproval.

32.     On Monday, August 17, 2020, having heard nothing from the District for the

6

remainder of the summer, and without any District offer of a program or placement for Gavin, Parents notified the District that they would continue Gavin's placement at Benchmark. They provided appropriate written intent of their decision to do so and requested that the District pay his tuition.

33.     On August 24, 2020, the District provided a second release of records; requested that Parents bring Gavin in for testing on the following day, August 25, 2020, without issuing a Permission to Evaluate ("PTE"); and scheduled an IEP meeting for the day after that, August 26, 2020.

34.     After the August 26 IEP meeting, the District issued an IEP that same day, plus a NOREP for Gavin to attend school virtually in the District. That IEP, however, was wholly inappropriate to meet Gavin's needs in reading, writing, math, and executive functioning, as the Hearing Officer correctly found, and was not reasonably calculated to yield meaningful educational benefit.

35.     The District only thereafter issued a PTE, which Parents promptly signed and returned to the District, giving consent. Parents promptly cooperated with the District and made Gavin available a few days after the IEP meeting, on September 1, 2020, for testing. All baseline data was complete by September 15th.

36.     Finally, on October 26, 2020, the District issued its Evaluation Report ("2020 ER"). The 2020 ER found that Gavin met IDEA eligibility criteria under the category of SLD in basic reading skills, reading fluency, reading comprehension, word reading, decoding and encoding, written expressions, basic writing skills, math problem-solving, and math calculations. Additionally, the 2020 ER found secondary IDEA eligibility for Gavin under the classification of Other Health Impairment ("OHI") for his ADHD and related executive functioning weaknesses.

37.     The District convened an IEP meeting on November 12, 2020 and issued an IEP that same day. It then issued a second NOREP on November 17, 2020 regarding that IEP, which Parents again rejected.

38.     The District issued another PTE form and performed additional testing. It released a Reevaluation Report ("RR") on January 4, 2021 and produced another IEP on February 4, 2021.

39.     The District's October 26, 2020 ER, its November 12, 2020 IEP, its January 4, 2021 RR, and its February 4, 2021 IEP, were not available to Parents at the time they had to make a decision about whether to continue Gavin's private placement at Benchmark for the 2020-21 school year, as the Hearing Officer properly found.

**B.     The Evidence Demonstrated Benchmark is Appropriate**

40.     The Benchmark School is an independent co-educational school for students in first through eighth grades who learn differently from their typical peers. Most Benchmark students have disabilities like Gavin's. These include language- and/or math-based learning differences such as dyslexia, executive functioning needs, auditory and visual processing differences, attention and focus difficulties, and/or the need for a small classroom and/or school environment to be successful.

41.     The student-to-teacher ratio at Benchmark is approximately three students per teacher. Class sizes at Benchmark typically range from seven to 13 students, and core classes such as Language Arts and Math have two teachers, reducing the instructional group to five or six.[2] The entire school population is approximately 175 students.

---

[2] The evidence demonstrated that, due to the pandemic, with some students choosing to receive instruction virtually, only seven to ten students were physically present in the classroom.

42.     The Benchmark School has integrated over 50 years of research and hands-on experience to refine a curriculum grounded in evidence-based methods and techniques for teaching students with learning differences, including the comprehensive and world-renowned reading program developed by the founder of, and implemented exclusively at, Benchmark.[3]

43.     Benchmark uses an intentional, reflective, and supportive approach that incorporates instructional techniques such as differentiated instruction, meta-cognition, the development of individual learner profiles, and multi-sensory instruction.

44.     Teachers at Benchmark address students' varied learning needs by first teaching students how to learn, providing them with the tools and strategies they need to be successful learners and strong self-advocates, building their confidence and competence, to help each of its students thrive. As a result, Gavin has flourished at Benchmark and made appropriate academic strides.

45.     Not only does Benchmark provide Gavin with the small, structured classroom setting and low student-to-teacher ratio that he requires, but the depth and breadth of academic, social, and emotional supports that are fully integrated within its program provide Gavin with the additional services he needs to be prepared for high school and beyond.

46.     The due process hearing evidence clearly established that Benchmark is providing, and provided, Gavin the supportive learning environment he requires to make appropriate and meaningful educational progress.

47.     During the 2020-21 school year at Benchmark, Gavin had three periods per day of direct instruction in Language Arts, including reading and written expression; two periods per day

---

[3] https://www.benchmarkschool.org/academics/benchmark-approach

9

of direct instruction in mathematics; and one period each per day of Science, Social Studies, and a special class (such as music or art).[4]

48.     Benchmark provided Gavin guided study each day for 20 minutes in the morning, 20 minutes at lunch, and again for 30 minutes at the end of the day. During these times, the school provided him direct instruction and support in organizational and executive functioning skills, and additional instruction in fluency and math. All his classes throughout the day included integrated skill instruction in executive functioning and organizational skills.

49.     Benchmark provided Gavin assistive technology support, and a variety of other supports such as teacher modeling, chunking of text/materials, note-taking, voice-to-text software, Learning Ally (digitally recorded books for playback), teacher feedback, planning/graphic organizers for writing, use of a computer, use of a calculator, and extra time for tests.[5]

50.     Gavin received one-on-one tailored support for his writing and math deficits, as well as his executive functioning needs, as part of his Benchmark program.

51.     Benchmark provided Gavin full-time, in person instruction from the beginning of the 2020-21 school year, despite the pandemic, which contrasts with the District's plans. Gavin does not function as well in a virtual classroom as in a physical one. Gavin is flourishing at Benchmark and making appropriate academic progress.

52.     The Family's private tutor, Karen Davis, at the Above Grade Level tutoring service, administered and scored the "Let's Go Learn" assessments in the record.[6] These data reflect

---

[4] Such classes are often now termed "encore" rather than "special" in public schools.

[5] In addition to the supports/accommodations noted in Gavin's individualized Benchmark documents, the school provided him a significantly greater number of supports, but that these are built into the program for all students at Benchmark.

[6] The District was initially confused at the hearing regarding where these data came from, as it had
*(footnote continued on next page)*

significant increases in word recognition, phonics, reading comprehension, and all areas of math. Benchmark administered "i-Ready" testing in both reading and math, and the record demonstrates that Gavin consistently made progress in those tests throughout his time at Benchmark. Benchmark's reports of academic progress, and its report cards, further reveal consistent progress, marking period after marking period, year after year, despite increases in demands and expectations.

53.     Additionally, despite the severity of his needs, and contrary to the Hearing Officer's findings, the evidence demonstrated that Gavin is aware of his disabilities of dyslexia and ADHD and is developing knowledge of the way in which his ADHD-related executive functioning deficits impair his effectiveness.

54.     Thus, despite the Hearing Officer's contrary statements, there is more than ample documentation of Gavin's progress at Benchmark.

55.     It is not necessary that the private school "cure" Gavin of his disabilities or completely remediate any of their effects. Although Benchmark's goals are appropriately high and difficult to achieve, merely because Gavin has not or may not meet them does not mean that Benchmark is inappropriate. The legally appropriate question is whether Gavin has made adequate progress in light of the nature and severity of his disabilities, and the answer to that question cannot be based solely upon the testing that the District administered.

56.     At the hearing, the District's school psychologist acknowledged that standardized testing such as that administered by the District is not designed as a progress-monitoring tool; instead, it is designed to identify the presence of a disability. Such testing is not aligned with any

---

reported them as being from Benchmark in one of its own District reports. However, this was an error. In conveying the data to the District, Parents made clear that it was from their tutor.

curriculum or program and is not designed to measure a student's progress in any such curriculum or program.

57.     Moreover, the testing results obtained by the District in those reevaluations is of doubtful accuracy. For example, evidence demonstrated that throughout that testing – which was provided at not much more than a moment's notice, Gavin engaged in negative self-talk, such as: "this is too hard," "this is too complicated," or "I can't do this." He would then guess at the answers.

58.     In contrast, in earlier evaluations, where there were no such concerns regarding Gavin's engagement in or frustration during the testing, his performance was significantly better.

59.     For example, a comparison of District testing from 2014, when Gavin was attending school in the District, with CHOP psychologist Peter Wiley's private testing in 2017, after Gavin had attended Benchmark for approximately one and one-half years, demonstrates significant increases in scores.

60.     In light of the above, the Hearing Officer should have given far more weight to the Benchmark testing and reports, as well as those of the Family's private tutor, Karen Davis, and Dr. Wiley.

61.     Thus, contrary to the Hearing Officer's findings, there is more than ample record evidence of Gavin's progress at Benchmark, and that it is and was a fully appropriate private placement.


V.     **Statutory Authority**

62.     The IDEA provides that an aggrieved party has the right to bring a civil action in federal district court, which conducts an independent review of the administrative record and any

additional evidence presented by the parties. 20 U.S.C. § 1415(i)(2); 34 C.F.R. § 300.516(c)(3);

*Shore Regional High School Bd. of Educ. v. P.S.*, 381 F.3d 194, 198 (3d Cir. 2004).

63.    The purpose of the IDEA is to ensure that "all children with disabilities have available to them a free and appropriate public education ["FAPE"] that emphasizes special education and related services designed to meet their unique needs and prepare them for further education, employment, and independent living." 20 U.S.C. § 1400(d)(1)(A); *Endrew F. v. Douglas County School Dist. RE-1*, 137 S. Ct. 988 (2017). IDEA and the regulations thereunder, 34 C.F.R. §§ 300.100 *et seq.*, and 22 Pa. Code Chapter 14, require that public school districts provide disabled children with a FAPE, as well as extensive due process procedures to effectuate that right.

> The IDEA protects the rights of disabled children by mandating that public educational institutions identify and effectively educate those children or pay for their education elsewhere if they require specialized services that the public institution cannot provide. Accordingly, schools must: (1) identify children in need of special education services (Child Find); and (2) provide a FAPE to disabled students.

*D.K. v. Abington Sch. Dist.,* 696 F.3d 233, 244 (3d. Cir. 2012) (internal citation and quotation omitted). The mechanism employed to achieve this objective is the IEP. 20 U.S.C. § 1412(4). A FAPE must be provided "under public supervision and direction, ... meet the standards of the State educational agency, ... include an appropriate preschool, elementary school, or secondary school education in the State involved … [and must be provided at] no cost to Parent." *Winkelman v. Parma City Sch. Dist.*, 550 U.S. 516, 524-25 (2007) (citing 20 U.S.C. § 1401(9) and (29)).

64.    A student's educational program must be judged by whether it is reasonably calculated to enable the child to receive meaningful educational benefit considering the child's *particular* circumstances, including the *social, emotional and physical* progress necessary to move

the child towards independence and self-sufficiency consistent with the child's cognitive potential. *Endrew F.*, 137 S.Ct. at 1001; *D.S. v. Bayonne Bd. of Educ.*, 602 F.3d 553, 557 (3d Cir. 2010).

65.    A school district has an obligation to reevaluate a child residing in the district known to be eligible under the IDEA, and to develop an IEP, when a parent either: (1) enrolls an eligible child in the district of residence after a period of absence; *or* (2) requests that the district evaluate and/or offer the family a proposed IEP. *L.T. v. N. Penn Sch. Dist.*, 342 F. Supp. 3d 610, 619 (E.D. Pa. 2018)*; Shane T. v. Carbondale Area Sch. Dist.*, 2017 WL 4314555 (M.D. Pa. 2017).

66.    Because a school district's obligation to offer FAPE derives from children's residency in the community, it must even offer IEPs to disabled students in private schools. The mandatory obligation to provide an offer of FAPE does not depend on enrollment in the public schools. 34 C.F.R. § 300.131; *Shane T.*, 2017 WL 4314555 at *9. Just "disabled status and residency" triggers the requirement. *Moorestown Twp. Bd. of Educ. v. S.D.*, 811 F. Supp. 2d 1057, 1077 (D.N.J. 2011) (collecting cases).

67.    A failure to offer an appropriate IEP or 504 Plan from the start of the school year will support tuition reimbursement. *M.D. v. Colonial School Dist.*, 2021 WL 1924083 (E.D. Pa. May 13, 2021) (Pratter, J.) (reversing hearing officer's finding that FAPE was not denied and granting tuition reimbursement and prevailing-party attorneys' fees); *Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375, 395-96 (E.D. Pa. 2012) (school district liable for tuition reimbursement under Section 504 for failing to offer the student a FAPE before the start of the student's 2009-10 school year); *Christen G. by Louise G. v. Lower Merion School Dist.,* 919 F.Supp. 793 (E.D. Pa. 1996) (failure to offer FAPE before start of school year entitled parent to tuition reimbursement).

68.    The IDEA permits the parents of an eligible child with disabilities to seek

reimbursement for the costs associated with a private school placement unilaterally made by the

Parents under certain circumstances. More specifically, federal regulations to the IDEA state:

> If the Parents of a child with a disability, who previously received special education and related services under the authority of a public agency, enroll the child in a private preschool, elementary school, or secondary school without the consent of or referral by the public agency, a court or a hearing officer may require the agency to reimburse the Parents for the cost of that enrollment if the court or hearing officer finds that the agency had not made FAPE available to the child in a timely manner prior to that enrollment and that the private placement is appropriate. A Parental placement may be found to be appropriate by a hearing officer or a court even if it does not meet the State standards that apply to education provided by the SEA and LEAs.

34 C.F.R. § 300.148 (c). The IDEA further defines "secondary school" as "a nonprofit institutional

day or residential school . . . that provides secondary education. . ." 34 C.F.R. § 300.36.

69.     The receipt of special education and related services through the public school

system is not a prerequisite for reimbursement. *Forest Grove School District v. T.A.*, 129 S. Ct.

2484 (2009). As such, the mere failure to make FAPE available to a student with a disability can

expose a district to a claim for tuition reimbursement. *Id.*

70.     Section 504 states, in part: "No otherwise qualified individual with a disability in

the United States, as defined in section 705(20) of this title, shall, solely by reason of her or his

disability, be excluded from the participation in, be denied the benefits of, or be subjected to

discrimination under any program or activity receiving Federal financial assistance...." 29 U.S.C.

§ 794.[7]

71.     To establish a violation of Section 504, a plaintiff must prove that: (1) he is

---

[7] Pennsylvania implements the statutory and regulatory requirements of Section 504 at the state level through the enactment of Chapter 15 of the Pennsylvania Code, 22 Pa. Code § 15 *et seq.* ("Chapter 15"). Chapter 15 neither preempts not expands the rights and liabilities under Section 504, and therefore courts treat Chapter 15 as coextensive with Section 504. *See K.K. ex rel. L.K. v. Pittsburgh Pub. Schs.*, 590 Fed. Appx. 148, n.3 (3d Cir. 2014). The violations of Section 504 described here are therefore also violations of Chapter 15.

"disabled" as defined by the Act; (2) he is "otherwise qualified" to participate in school activities; (3) the school or the board of education receives federal financial assistance; and (4) he was excluded from participation in, denied the benefits of, or subject to discrimination at, the school. *Ridgewood*,172 F.3d at 253.

72.     "When a state fails to provide a disabled child with a free and appropriate education, it violates the IDEA. However, it also violates [Section 504] because it is denying a disabled child a guaranteed education merely because of the child's disability. It is the denial of an education that is guaranteed to all children that forms the basis of the claim." *Andrew M.*, 490 F.3d at 350.

73.     Section 504 requires districts to provide disabled students a FAPE as part of Section 504's prohibition of discrimination. *D.K. v. Abington Sch. Dist.*, 696 F.3d 233, 253 (3d Cir. 2012) ("As under the IDEA, providing a FAPE in accordance with § 504 requires a school district to reasonably accommodate the needs of the handicapped child so as to ensure meaningful participation in educational activities and meaningful access to educational benefits.") (internal quotation marks omitted).

74.     Section 504 further requires that "a public elementary or secondary education program shall annually undertake to identify and locate every qualified handicapped person residing in the recipient's jurisdiction who is not receiving a public education and take appropriate steps to notify handicapped persons and their parents or guardians of the recipient's duty under this subpart." 34 C.F.R. §§ 104.32, 104.33, 300.111; *Ridgewood Bd. of Educ. v. N.E. ex rel. M.E.*, 172 F.3d 238, 253 (3d Cir. 1999); *W.B. v. Matula*, 67 F.3d 484, 492 (3d Cir. 1995), *abrogated on other grounds by A.W. v. Jersey City Pub. Sch.*, 486 F.3d 791 (3d Cir. 2007). The District must timely identify and evaluate all children it has reason to suspect might have a disability. The

District must also ensure that its evaluations to determine actual eligibility for services occur within a *reasonable time* after school officials know or should reasonably have known that the child is likely to have a disability. *Id.* at 501; *L.T. ex rel. B.T. v. Mansfield Twp. Sch. Dist.*, No. CIV.A.04-1381(NLH), 2009 WL 737108, at *7 (D.N.J. Mar. 17, 2009) (finding, in Section 504 context: "waiting until after the start of the school year to even contemplate the development of an educational plan[] constitutes reckless disregard of the school district's duty to provide B.T. with a free appropriate education. Moreover, the fact that the development of his educational plan was not undertaken until after the school year began, and only after the parent [contacted school], demonstrates that Defendant acted with deliberate indifference to B.T.'s right to his education.").

75.     Regulations implementing Section 504 require public schools to provide a FAPE to each qualified disabled student regardless of the nature or severity of his or her disability. 34 C.F.R. §§ 104.33(a), 104.33(b)(1). The substantive requirements of Section 504 in the education context are equivalent to the requirements under the IDEA. *James S. v. School Dist. of Phila.*, 559 F. Supp.2d 600, 620 (E.D. Pa. 2008) (citing *Molly L. v. Lower Merion School Dist.*, 194 F. Supp.2d 422, 426 (E.D. Pa. 2002)).

76.     While under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 *et seq.,* only students with 13 specifically defined categories of disability are eligible, Section 504/Chapter 15 defines disability more broadly. The Chapter 15/Section 504/ADA analysis focuses on "a physical or mental impairment that substantially limits one or more major life activities," 42 U.S.C. § 12102(1) and 22 Pa. Code § 15.2, which, here, included SLD and ADHD.[8]

---

[8] Section 504 and Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101 *et seq.*, are interrelated. *See* 28 C.F.R. § 35.108 (a)(2)(i) (Section 504 regulation) ("The definition of
*(footnote continued on next page)*

77.    Major life activities are very broadly defined and include but are not limited to caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, *learning, reading*, *concentrating,* thinking, communicating, and working. Id. at 12102(2). Thus, dyslexia, SLD, ADHD, anxiety, and obsessive-compulsive behaviors, are all certainly covered.

78.    A school may violate Section 504 independent of any violations of IDEA, and tuition reimbursement is an authorized equitable remedy under Section 504, just as under IDEA. *Lauren G. v. West Chester Area School Dist.*, 906 F.Supp.2d 375 (E.D. Pa. 2012) (granting tuition reimbursement for school district's failure to provide FAPE under Section 504 during period for which court found IDEA did not warrant relief); *Molly L.*, 194 F. Supp. 2d at 429 n.7 ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act and IDEA.").

79.    In determining whether tuition reimbursement should be awarded to a parent, courts have created the now well-established three-part test requiring a court or hearing officer to determine: (1) whether the program and placement offered by the school district at the time the child was enrolled in the private school was appropriate; (2) if not, whether the private school selected by the parents was appropriate; and (3) whether the equities in the case favor reimbursement. *Florence County School District Four, et al., v. Carter*, 510 U.S. 7 (1993); *Warren G. v. Cumberland County Sch. Dist.,* 190 F.3d 80, 84 (3d Cir. 1999); *Ridgewood*, 172 F.3d at 248.

80.    A parent's burden to establish the appropriateness of the private school at issue is not a heavy one, and the law affords considerable leeway to the parent's choice of private school:

---

'disability' shall be construed broadly in favor of expansive coverage, to the maximum extent permitted by the terms of the ADA"). Section 504 looks to 29 U.S.C. § 705(20) for its definition of individual with a disability: "any person who has a disability as defined in section 12102 of Title 42 [the ADA]." 29 U.S.C. § 705(20)(B).

> A parent's decision to unilaterally place a child in a private placement is proper if the placement is appropriate, i.e., it *provides significant learning and confers meaningful benefit*. That said, the parents of a disabled student need not seek out the perfect private placement in order to satisfy IDEA In fact, the Supreme Court has ruled that a private school placement may be proper and confer meaningful benefit despite the private school's failure to provide an IEP or meet state educational standards.

*Mary Courtney T. v. School District of Philadelphia*, 575 F.3d 235, 242 (3d Cir. 2009) (internal citations and quotation marks omitted, emphasis added).

81.     Moreover, recognizing that just about any private school selected by parents would be a school specializing in educating children with disabilities and therefore more restrictive than the public school, the courts have consistently found that to apply the IDEA's "least restrictive environment" mandate on a private school would eviscerate the remedy of tuition reimbursement. *See, e.g.*, *Ridgewood*, 172 F.3d 238 at 245, 249; *Warren G.*, 190 F.3d 80.

82.     As such, in the present matter, the Parents need not have shown that Benchmark met all state and federal requirements for public schools, or was the perfect placement, or even that Gavin met the goals that Benchmark aims at having all its students meet by the end of their eighth-grade year, but only that the Benchmark program was designed and reasonably calculated to afford Gavin progress through providing the supports and services he required to receive meaningful educational benefit.  *Carter*, 510 U.S. 7; *Mary Courtney T*; 575 F.3d at 242; *Warren G.,* 190 F.3d 80.

83.     Because Parents met their burden to establish all three prongs, the Hearing Officer should have awarded tuition reimbursement. The evidence presented during the hearing demonstrated that the District failed to offer an appropriate program and placement for the 2020-21 school year. It also demonstrated that the program the Benchmark School provided Gavin the special education supports and services necessary for him to benefit from his education. Finally,

the equities in this case did not favor a reduction or denial of tuition reimbursement.

## VI.     <u>The Hearing Officer's Errors</u>

84.     Pursuant to the above standards, the District failed in its statutory duties to Gavin under both the IDEA and Section 504.

85.     The Hearing Officer's finding that the IEP the District offered at the start of the 2020-21 school year was inappropriate is correct, as was her ruling that the two subsequent revisions of that IEP are irrelevant, since they arrived too late to make any difference.

86.     However, the ruling that Benchmark was inappropriate is erroneous and rests on legal and factual error. The evidence clearly established that, under the applicable legal standard, Benchmark is an appropriate private placement for Gavin.

87.     The Benchmark School is a longstanding, pioneering and esteemed private school for children with disabilities that is over 50 years old. Pennsylvania special education hearing officers have found it appropriate for tuition reimbursement numerous times, including in *E.G. v. Downingtown Area School Dist.*, ODR #13618/12-13AS (July 25, 2013, Valentini, CHO), and in *E.R. by M.R. v. Ridley School Dist.*, ODR #9519/08-09 KE (April 21, 2009, DeLauro, HO). Although courts later reversed that decision on the ground that that school district had offered FAPE, the opinions never called into question the finding that the Benchmark School was appropriate; in fact, those proceedings eventually resulted in a substantial "stay-put" award of tuition, *see M.R. v. Ridley School Dist.*, 744 F.3d 112 (3d Cir. 2014), as well as extensive counsel fees, *M.R. v. Ridley School Dist.*, 868 F.3d 218 (3d Cir. 2017).

88.     The Hearing Officer's ruling in the present matter appears to rely more on her misunderstanding of the specifics of Benchmark's reading program then it does on any actual

data/testing, which demonstrates growth. Contrary to the findings of the Hearing Officer, the evidence at the due process hearing solidly demonstrates that Benchmark *does* provide Gavin an evidence-based reading program.

89.     While it is true that Benchmark does not use a "published" program such as Wilson Reading, Dr. Eleanor Gensemer, the head of the middle school at Benchmark, testified clearly that the instructional techniques used to teach its students, including Gavin, are research- and evidence-based techniques. Dr. Gensemer elaborated that Benchmark has found over the decades of its existence that no one published program tends to meet all of the reading needs of its students.

90.     Dr. Gensemer's testimony, along with the overall data, should have been sufficient to meet the relatively low legal standard for appropriateness of the private school placement.

91.     In finding Benchmark inappropriate, the Hearing Officer appeared to rely on the fact that Benchmark does not use a published program. But there is no law requiring a private school for students with disabilities to use only off-the-shelf curricula, only that the program be based on research. And in this instance, Benchmark's approach is not only completely based on research, but it is also more tailored and individualized – and even more appropriate – than a prepackaged rubric.

92.     In fact, Benchmark's curriculum anticipated and influenced the development of such programs:

> Two "schools that arose early on in [the] history [of developing methods for teaching children with language-based learning disabilities including dyslexia] were the Benchmark School and Gow in New York. Both of these schools used Samuel Orton's theories about teaching dyslexic children to develop their own methodologies to deliver this instruction to children that would have an appeal to children and work for them; Gow called its method "Reconstructive Language," and Benchmark called its method "Word Detectives." These two schools developed the path for many of the research-based programs that exist today, such as the Wilson Reading System in which Barbara Wilson took the principles of Orton and

put them into a format that was very structured, very mastery-based, and very sequential, such that the approach is like teaching reading mathematically.

Whereas some schools, public and private, use the [off-the-shelf] programs that were developed through research, using guiding principles that are available now [such as Wilson], other programs historically developed over many years, again, conforming to the principles that have been discovered through research and also adapting and reformatting their programs; Benchmark is one of those schools, using the "Benchmark Method" that was designed by [Benchmark founder] Irene Gaskins.

*E.G.* at 12-13.

93.     The standardized testing that the District performed during the 2020-21 school year as part of this process is inconsistent at best. However, Gavin's previous District and private evaluations, both before and after entering Benchmark, demonstrated progress. Although Gavin was still performing below grade level at the time of the District's testing, given the severity of his SLD, together with his OHI of ADHD, that is not surprising. His progress reports and data from Benchmark clearly reflected growth.

94.     Similarly, the "Let's Go Learn" progress data from Karen Davis, a private tutor who works with Gavin and the Family's other children over the summer, also showed considerable growth.

95.     The evidence presented at the due process hearing overwhelmingly demonstrated that although given the severity of his disability, Gavin continues to display significant academic and functional needs, the degree of progress made by Gavin since enrolling at Benchmark is appropriate. Parents established the appropriateness of Benchmark and therefore met the second prong of the reimbursement analysis.

96.     The Hearing Officer did not consider the third prong of the *Burlington* tuition reimbursement analysis, the equities in this case. Under that prong, a court or hearing officer is

empowered to reduce or deny tuition reimbursement: (1) where the parents failed to provide the District with written notice of their intent to withdraw their child from the public schools and seek reimbursement for private placement; (2) where the public school expressed its intent to evaluate the student at the time of withdrawal (through the issuance of a permission to evaluate) and the parents failed to cooperate in the evaluation; and/or (3) where the parents acted unreasonably. 34 C.F.R. § 300.148(d).

97.     The evidence demonstrates that none of these circumstances apply. Parents acted reasonably at all times, and there is no equitable basis to reduce or deny tuition reimbursement. More specifically, the Parents have always been up-front in all communications and interactions with the District, including expressing their concerns about Gavin's program. Parents always provided consent to the District to conduct any evaluation it requested, and they attended and fully participated in all meetings, including IEP meetings. When requested, Parents signed releases of information and/or provided records in their possession to the District.

98.     Moreover, before the 2020-21 school year started, Parents provided written notice of their intent to place Gavin at his private school and to seek reimbursement from the District for that tuition, as the IDEA requires.

99.     The evidence demonstrates that the equities weighed in favor of awarding tuition reimbursement.

100.     Similarly, the Family respectfully requests that the Court either determine it from the record or remand for consideration of it.

101.     As discussed above (*see* "V. Statutory Authority"), tuition reimbursement is also an available remedy under Section 504, as well as under IDEA. *Molly L.*, 194 F. Supp. 2d at 429 n.7 ("Tuition reimbursement has been awarded in cases arising under both the Rehabilitation Act

and IDEA."); *Kevin M. v. Bristol Twp. School Dist.,* 2002 WL 73233, at *5 (E.D. Pa. Jan. 16, 2002) (because there are "few differences, if any," between requirements of IDEA and Section 504, "[t]he Court ... finds that plaintiff may pursue his tuition reimbursement claim against Bristol Township pursuant to Section 504 as well as IDEA."); *Borough of Palmyra., Bd. Of Educ. v. F.C.,* 2 F. Supp. 2d 637, 641-42 (D.N.J. 1998) (rejecting argument that tuition reimbursement is not available form of relief under Section 504); *Christen G. v. Lower Merion School Dist.,* 919 F. Supp. 793, 816, 821 (E.D. Pa. 1996) (reimbursement for costs of private school education was appropriate relief under both the IDEA and Section 504).

102.    Because the District violated IDEA by failing to provide Gavin a FAPE, it also violated Section 504, and the Hearing Officer erred failing to order tuition reimbursement based on this violation.

103. The Hearing Officer's Decision did not provide the Family *any* remedy for what the Hearing Officer properly found was the District's violation of Gavin's right to a FAPE. Although the Family seeks tuition reimbursement, the Family also respectfully suggests that the Court should consider whether compensatory education is warranted in an amount roughly equivalent to the tuition at Benchmark. It is within this Court's power to order such compensatory education, which, like tuition reimbursement, is an equitable remedy.

104.    Now that the Hearing Officer has determined that the program is inappropriate, compensatory education is an available remedy. Alternatively, the Court could remand the matter to the Hearing Officer, with directions to determine the amount of compensatory education.

## VII.    <u>Conclusion</u>

**WHEREFORE**, the Plaintiffs respectfully request that this Court:

1.      Assume jurisdiction over this action;

2.      Reverse the Hearing Officer's Decision to the extent it finds that Benchmark inappropriate, and thus that the Family is not entitled to tuition reimbursement and related costs for the school year at issue; and

3.      Order the District to pay tuition reimbursement and related costs for Gavin's 2020-21 school year, and until such time as the District offers FAPE;

4.      In the alternative, find that the District's failure to provide FAPE is remediable through compensatory education or that the matter should be remanded to the administrative process with specific instructions to the Hearing Officer to determine an appropriate amount of compensatory education for the District's violations;

5.      Order the Defendant to pay Plaintiffs their reasonable attorneys' fees and related costs;

6.      Declare the Defendant's actions and omissions to be violative of IDEA, Section 504, and Pennsylvania law; and

7.      Grant such other relief as this Court deems proper.


Respectfully submitted,

John W. Goldsborough, Esquire
ID No. 73063

Michael J. Connolly, Esquire
ID No. 82065

Dennis C. McAndrews, Esquire
ID No. 28012


25

McANDREWS, MEHALICK, CONNOLLY,
HULSE & RYAN, P.C.
30 Cassatt Avenue
Berwyn, PA 19312
(610) 648-9300 (phone)
(610) 648-0433 (fax)
Attorneys for Plaintiffs